Slip Op. 17-66

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ITOCHU BUILDING PRODUCTS CO., INC., TIANJIN JINGHAI COUNTY HONGLI INDUSTRY & BUSINESS CO., LTD., HUANGHUA JINHAI HARDWARE PRODUCTS CO., LTD., TIANJIN JINCHI METAL PRODUCTS CO., LTD., SHANDONG DINGLONG IMPORT & EXPORT CO., LTD., TIANJIN ZHONGLIAN METALS WARE CO., LTD., HUANGHUA XIONGHUA HARDWARE PRODUCTS CO., LTD., SHANGHAI JADE SHUTTLE HARDWARE TOOLS CO., LTD., SHANGHAI YUEDA NAILS INDUSTRY CO., LTD., SHANXI TIANLI INDUSTRIES CO., LTD., MINGGUANG ABUNDANT HARDWARE PRODUCTS CO., LTD., CHINA STAPLE ENTERPRISE (TIANJIN) CO., LTD., and CERTIFIED PRODUCTS INTERNATIONAL INC., <br><br>    Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br> MID CONTINENT NAIL CORPORATION, <br><br>    Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 13-00132 |

# **OPINION**

[Plaintiffs' motion for judgment on the agency record in antidumping duty administrative review granted in part, denied in part.]

Dated: June 5, 2017

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of Washington, DC, argued for plaintiffs.  With him on the brief were Bruce M. Mitchell and Dharmendra N. Choudhary.

Tara K. Hogan, Senior Trial Counsel, U.S. Department of Justice, of Washington, DC, argued for defendant.  On the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Sosun Bae, Trial Attorney.  Of counsel on the brief was Jessica DiPietro, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, and Jordan C. Kahn, Picard, Kentz & Rowe, LLP, of Washington, DC, argued for defendant-intervenor.  On the brief was Ping Gong, The Bristol Group PLLC, of Washington, DC.

Restani, Judge:  This action challenges the U.S. Department of Commerce ("Commerce")'s final results rendered in an administrative review of the antidumping ("AD") duty order on certain steel nails from the People's Republic of China ("PRC"), covering the period of August 1, 2010, through July 31, 2011.  See Certain Steel Nails from the People's Republic of China:  Final Results of Third Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 16,651, 16,651 (Dep't Commerce Mar. 18, 2013) ("Final Results"); see also Certain Steel Nails from the People's Republic of China:  Issues and Decision Mem. for the Final Results of the Third Antidumping Duty Admin. Review at 1, PD 359 (Mar. 5, 2013) ("I&D Memo").  Plaintiffs Itochu Building Products Co., Inc., Tianjin Jinghai County Hongli Industry & Business Co., Ltd., Huanghua Jinhai Hardware Products Co., Ltd., Tianjin Jinchi Metal Products Co., Ltd., Shandong Dinglong Import & Export Co., Ltd., Tianjin Zhonglian Metals Ware Co., Ltd., Huanghua Xionghua Hardware Products Co., Ltd., Shanghai Jade Shuttle Hardware Tools Co., Ltd., Shanghai Yueda Nails Industry Co., Ltd., Shanxi Tianli Industries Co., Ltd., Mingguang Abundant Hardware Products Co., Ltd., China Staple Enterprise (Tianjin) Co., Ltd., and Certified Products International Inc. (collectively "Itochu") seek remand of the Final Results, arguing that Commerce erred in selecting surrogate financial statements and

surrogate value data for steel wire rod, an input of steel nails.  Pls.' Rule 56.2 Mot. for J. upon the Agency R. 1, ECF No. 27 ("Itochu Br.").  Defendant United States ("the government") and defendant-intervenor Mid Continent Nail Corporation ("Mid Continent") contend that the Final Results are based on substantial evidence and are in accordance with law.  Def.-Intvnr. Mid Continent Nail Corp.'s Resp. to Pls.' USCIT Rule 56.2 Mot. for J. upon the Agency R. 2–3, ECF No. 40 ("Mid Continent Br."); Def.'s Opp'n to Pls.' Mot. for J. upon the Agency R. 2, ECF No. 41 ("Gov't Br.").  For the reasons stated below, the court remands the Final Results on the issue of steel wire rod selection.  The court further instructs Commerce on remand to consider its financial statement choices in the light of its wire rod decision.

## BACKGROUND

Following a request for review, Commerce initiated an AD review into steel nails from the PRC.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 76 Fed. Reg. 61,076, 61,077 (Dep't Commerce Oct. 3, 2011).  Because Commerce considers the PRC a non-market economy ("NME"), Commerce creates a hypothetical market value for steel nails in conducting its review.  See Downhole Pipe & Equip. LP v. United States, 887 F. Supp. 2d 1311, 1320 (CIT 2012) (citing Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999)).  To construct such a value, Commerce relies on data from a market economy or economies to provide surrogate values for the various factors of productions ("FOPs") used to manufacture the subject merchandise.  See 19 U.S.C. § 1677b(c)(1)(B).  In addition, Commerce uses financial statements from producers of identical or comparable merchandise to yield surrogate financial ratios to calculate "general expenses and profit" for inclusion in normal value.  See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 303 n.7, 366 F. Supp. 2d 1264, 1277 n.7 (2005).  The essence of the dispute

here is Itochu's preference for certain FOPs from Ukraine as opposed to FOPs from Thailand, as selected by Commerce and supported by Mid Continent.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds Commerce's final results in an AD review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.     Specificity of Steel Wire Rod Data**

   A.     Facts

The parties placed three data sources on the record for calculating the surrogate value of steel wire rod, the primary input of steel nails: (1) Thai Global Trade Atlas ("GTA") import data; (2) Ukrainian GTA import data; and (3) Ukrainian Metal Expert data, a source reflective of domestic prices.  I&D Memo at 16–17; see Itochu First Surrogate Value Submission at Ex. 5A, PD 201–20, 222–27 (Apr. 30, 2012) ("Itochu First SV Submission") (Metal Expert data); id. at Ex. 4 at 1–2, 102 (Ukrainian GTA data); Commerce Surrogate Values for the Final Results at 3 & Attach. 2, PD 356 (Mar. 5, 2013) ("SVs for Final Results") (Thai GTA data).  Commerce concluded that the data sources were equal in all respects except for the data sets' specificity in relation to the steel wire rod used by the mandatory respondents.[1]  I&D Memo at 17–19.  The two factors Commerce considered in determining specificity were wire rod diameter and carbon

---

[1] Commerce found that the data sources were all publicly available, contemporaneous with the period of review, representative of a broad-market averages, from an approved surrogate country, and tax- and duty-exclusive.  I&D Memo at 17.  The steel wire rod used by the mandatory respondents is 6.5 millimeters in diameter.  Certain Steel Nails from the People's Republic of China:  Preliminary Results and Partial Rescission of the Third Antidumping Duty Administrative Review, 77 Fed. Reg. at 53,845, 53,848 (Dep't Commerce Sept. 4, 2012) ("Preliminary Results").

content of the steel.  Id. at 17–18.  Regarding diameter, the Metal Expert data reported the value of steel wire rod for diameters of 6.5 millimeters ("mm") – 8 mm, while the GTA import data sets reported the price of steel wire rod and bars for diameters 14 mm and below.  Itochu First SV Submission at Ex. 4 at 1–2, 102 & Ex. 5A; SVs for Final Results at 3 & Attach. 2; see Certain Steel Nails from the People's Republic of China:  Preliminary Results and Partial Rescission of the Third Antidumping Duty Administrative Review, 77 Fed. Reg. at 53,845, 53,848 (Dep't Commerce Sept. 4, 2012) ("Preliminary Results").  Commerce concluded that the GTA import data and Metal Expert data were "comparably specific" on diameter because the "[r]espondents' diameter ranges are covered within" the 14 mm and below category.  I&D Memo at 18.  On carbon content, Commerce determined that the GTA import data sets were more specific than the Metal Expert data because the former listed separate prices for low- and medium- carbon content steel, while the latter did not.  Id. at 18.  Accordingly, Commerce rejected the Metal Expert data as an option because the GTA import data sets were "comparably specific" to the Metal Expert data on diameter, and more specific on carbon content.  Id. at 17–18.  To select between the Thai and Ukrainian GTA import data sets, Commerce relied on its regulatory preference for valuing all factors "in a single surrogate country."  19 C.F.R. § 351.408(c)(2); see I&D Memo at 18.  Because Commerce had previously selected Thailand as the primary surrogate country, largely based on the suitability of financial statements, Commerce chose to use the Thai GTA import data over the Ukrainian data in its calculations.  I&D Memo at 13–14, 18.

Itochu argues that substantial evidence does not support Commerce's selection of the Thailand GTA import data as the best available information for valuing steel wire rod.  Itochu Br. at 25–36.  Itochu contends that Commerce's conclusion that the Metal Expert data and GTA

Case 1:13-cv-00132-JAR    Document 97    Filed 06/05/17    Page 6 of 17

Court No. 13-00132                                                                                                    Page 6

import data are "comparably specific" with respect to the wire rod used by the mandatory respondents in terms of wire rod diameter is "clearly incorrect," and that it contradicts Commerce's conclusions in past proceedings. Id. at 27–29. Given this, Itochu argues, Commerce was required to explain whether diameter specificity or carbon content is a more important factor in determining the price of steel wire rod, and posits that diameter is more important. Id. at 30, 32–33. Itochu presents other subsidiary or related arguments which are addressed only as necessary at this stage.[2]

Mid Continent and the government respond that Commerce's selection of the Thai GTA import data was supported by substantial evidence. Mid Continent Br. at 31–41; Gov't Br. at 16–21. Mid Continent backs Commerce's conclusion that the Metal Expert wire rod diameter data is "comparably specific" to the GTA import data sets, arguing that Commerce's use of diameter in selecting surrogate data during the second period of review is irrelevant because it is a separate past proceeding, and that the other cases cited by Itochu are inapposite because carbon content was not a factor there. Mid Continent Br. at 36–38. Mid Continent also contends that

---

[2] Itochu contends that, as between the Metal Expert data and the Ukrainian GTA import data, the Metal Expert data is preferable because it comes from a domestic source, which is preferable where, as here, domestic production exceeds consumption and imports. Itoch Br. at 30–31. In addition, Itochu contends that the Metal Expert data is superior to the Thai GTA import data because: (1) Commerce's preference for using values from a single surrogate country only applies when the data from different countries is equally specific, which, Itochu argues, is not the case here; (2) Thailand should not have been chosen as the surrogate country in the first place because the Dneprometiz financial statement from Ukraine should have been used instead of the Thai financial statements; (3) Commerce should choose the surrogate country based on the country from which data comes for the primary factor in the cost of steel nails, steel wire rod, rather than on the country from which financial statements were drawn, which is a relatively low influencer of the subject merchandise's cost; and (4) the Metal Expert data is corroborated by the Ukrainian GTA import data. Id. at 34–36; Itochu's Reply to the United States' and Mid Continent Nail Corp.'s Resps. to Itochu's Rule 56.2 Mot. for J. Upon the Agency R. 15–17, ECF No. 48 ("Itochu Reply Br.").

Commerce "found carbon content more important for purposes of valuing wire rod [than diameter] in the underlying review." Id. at 37 (citing I&D Memo at 18).[3]

    B.    Discussion

"In selecting data to value factors of production, Commerce must choose 'the best available information regarding the values of such factors in a market economy country or countries." Allied Pacific Food (Dalian) Co. v. United States, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313 (2006) (quoting 19 U.S.C. § 1677b(c)(1)).  "In assessing data and data sources, it is [Commerce's] stated practice to use . . . prices specific to the input in question[.]"  Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004), http://enforcement.trade.gov/policy/bull04-1.html (last visited May 31, 2017).  In addition, Commerce "normally will value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).

    Substantial evidence does not support Commerce's determination that the Metal Expert data and GTA import data sets were "comparably specific."  See I&D Memo at 18.  The Metal Expert data reports prices for wire rods with a diameter of 6.5 mm to 8 mm, whereas the GTA import data reports prices for wire rods and bars with a diameter of 14 mm and under.  Itochu First SV Submission at Ex. 4 at 1–2, 102 & Ex. 5A; SVs for Final Results at 3 & Attach. 2. Commerce's rationale for concluding that the data sets were "comparably specific" was that the

---

[3] Mid Continent identifies other alleged defects with the Metal Expert data, such as that the prices are reflective of only one company rather than a "price average," and that the data is an incorrect summarization of that one company.  Mid Continent Br. at 39.  Commerce rejected these as "unsupported speculation."  I&D Memo at 17.  Mid Continent also states that, as the GTA import data is superior to the Metal Expert data, and because Commerce correctly chose to use the Thai financial statements, Commerce properly applied its preference for using surrogate information from a single country.  Mid Continent Br. at 39–41.

mandatory respondents' diameter of 6.5 mm is "covered within" the GTA import data.  I&D Memo at 18; see Preliminary Results, 77 Fed. Reg. at 53,848.  But, this fact does not mean the two diameter ranges are equally specific, or that a category which also covers bars is even probative.[4]  Furthermore, Commerce has on numerous occasions found the very basket category at issue in this case to be less specific than a data set reporting prices for steel wire rod of a single diameter, such as 6 mm.  See, e.g., Certain Steel Nails from the People's Republic of China:  Issues and Decision Memorandum for the Final Results of the Second Antidumping Duty Administrative Review at 15–16, A-570-909 (Feb. 23, 2012), available at http://enforcement.trade.gov/frn/summary/prc/2012-4877-1.pdf (last visited May 31, 2017) ("[W]e find that the JPC data is more specific to the input in question than the GTA data because the Indian HTS category under which it enters is a basket category that includes many different sizes of [steel wire rod ("SWR")] (i.e., SWR with diameters ranging from below 14 mm), as well as steel bars, which are not used in the production process at all."); Issues and Decision Memorandum for the Antidumping Duty Investigation of Wire Decking from the People's Republic of China:  Final Antidumping Duty Determination at 20, A-570-949 (June 3, 2010), available at http://enforcement.trade.gov/frn/summary/prc/2010-13977-1.pdf (last visited May 31, 2017) (similar); Certain Kitchen Appliance Shelving and Racks from the People's Republic of China:  Issues and Decision Memorandum for the Final Determination at 31, A-570-941 (July 20, 2009), available at http://enforcement.trade.gov/frn/summary/prc/E9-17717-1.pdf (last visited May 31, 2017) (similar).  Contrary to Mid Continent's contention, Commerce's consideration of carbon content in this case, as opposed to previous cases, does not reasonably

---

[4] For example, if a person is actually 36 years old, an age range of "35 to 40 years" provides a more specific answer to the question of what that person's age is than "100 years or less."

explain Commerce's conclusion on the narrow question of whether 6.5 mm to 8 mm steel wire rod data is more specific than data reporting prices on rod and bars 14 mm and under.[5] See Mid Continent Br. at 37–38. Carbon content is irrelevant to the narrow conclusion that Commerce reached, that as to diameter the data sets were equally specific. Arguably, the Metal Expert and GTA import data diameter ranges are "comparably specific," if diameter is a non-factor in determining price. But, Commerce did not find that this is the case,[6] see generally I&D Memo, and Itochu has introduced evidence indicating that diameter plays some role in influencing wire rod price, see Itochu Post-Preliminary Surrogate Value Rebuttal Submission at Ex. 4, PD 328 (Oct. 9, 2012).

Without substantial evidence for Commerce's "comparably specific" diameter conclusion, the court cannot uphold Commerce's decision to select the Thai GTA import data set because Commerce premised its rejection of the Metal Expert data on this conclusion. See I&D Memo at 17–18.[7] Given the court's rejection of Commerce's diameter specificity conclusion,

---

[5] Additionally, neither Mid Continent nor Commerce identify any cases in which Commerce has found a broad range of diameters to be "comparably specific" to a smaller range.

[6] Indeed, Commerce "note[d] that in previous segments of this case, [Commerce] has found that diameter is a key factor as to specificity for valuing wire rod." I&D Memo at 17. Commerce nowhere suggests that that is not also true in this proceeding.

[7] As Commerce concluded,
> [W]hile Ukrainian and Thai GTA import data are basket categories reporting diameter with a range of 14mm and below, [Commerce] also finds that these data sources are specific because the Respondents' diameter ranges are covered within these HTS categories. Accordingly, [Commerce] finds that these three data sources are comparably specific to wire rod because each source covers the determinative factor, diameter, of the input. . . . [Commerce] will examine the three possible data sources for valuing the steel wire rod input based on their specificity to the carbon content.

I&D Memo at 17–18.

Commerce's only remaining rationale for preferring either of the GTA import data sets over the Metal Expert data is carbon content specificity. See id. at 18–19. Although carbon content possibly plays some role in influencing wire rod price, as Commerce concluded,[8] I&D Memo at 18, Commerce nowhere states that carbon content is more important than wire rod diameter in affecting price. See SEC v. Chenery Corp., 318 U.S. 80, 88 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Mid Continent cites to the I&D Memo in support of its argument that Commerce concluded carbon content is more important than wire rod diameter in influencing price, but such a statement cannot be found. See Mid Continent Br. at 37 (citing I&D Memo at 18). Accordingly, the court remands to Commerce the choice of which data set to use in determining the surrogate value of steel wire rod.[9]

**II.     Public Availability of the Dneprometiz Financial Statement**

A.    Facts

In its Final Results, Commerce chose to use financial statements from the Thai companies L.S. Industry Co., Ltd. and Bangkok Fastening Co., Ltd. in the financial ratios calculations, rather than the Ukrainian company Dneprometiz. I&D Memo at 10, 15.

---

[8] Commerce cited to questionnaire responses of the respondents to support its conclusion. See Stanley Second Suppl. Section C & D Questionnaire Resp. at Exs. SSCD-5, SSCD-7, SSCD-8, CD 236 (July 25, 2012); Hongli Suppl. Section C Questionnaire Resp. at Exs. 5–7, CD 217–18 (June 8, 2012). In addition, Itochu does not contest that carbon content plays at least some role in influencing the price of steel wire rod.

[9] Because the court concludes that Commerce's determination on wire rod diameter specificity is not supported by substantial evidence, the court does not reach the issue of whether Commerce erred in preferring the Thai GTA import data over the Ukrainian GTA import data on the basis of its financial data choice and the resulting single country preference. The court notes, however, that steel wire rod is the primary influencer of steel nail prices, and except in extraordinary circumstances it should play the principal role in determining the primary surrogate country.

Commerce's sole rationale for this decision was that Dneprometiz's statement was not "publicly available." Id. at 14–15. Commerce reached this public availability conclusion for a variety of reasons. First, Commerce rejected Itochu's assertion that a "Dneprometiz Market Report" ("Report") created by and found on Marketpublishers.com indicated that Dneprometiz's financial statement is "publicly available." Id. at 14. Commerce's concerns with the Report included a lack of record evidence demonstrating that the Dneprometiz's financial statement served as the basis for the Report,[10] that there were "discrepancies" between the Report and the Dneprometiz financial statement, and that the Report is simply "a market report providing summary information about Dneprometiz." Id. Second, Commerce reasoned that the Report did not make the Dneprometiz financial statement publicly available because Dneprometiz's website "states that company materials are only available at the written request of the shareholders." Id. at 15. Third, Commerce relied on the fact that when Mid Continent e-mailed Dneprometiz and asked, with Dneprometiz's financial statement attached, "[i]s this financial statement available to the public?," Dneprometiz responded that "[w]e forbid you to use the provided information to the public." Mid Continent Case Br. at Attach. 1, PD 334–39 (Oct. 19, 2012); see I&D Memo at 15. Lastly, Commerce stated that Itochu "did not indicate how they obtained the [Dneprometiz] financial statements." I&D Memo at 15. For these reasons, Commerce concluded that the Dneprometiz financial statement was not "publicly available." Id. Itochu also argued before Commerce that public availability "is not an absolute criterion" for selecting financial statements, but Commerce responded that "this is not an instance where the non-public financial

---

[10] The Dneprometiz financial statement is a separate record document from the Report. Mid Continent Surrogate Value Submission at Ex. 2, PD 316–18 (Oct. 1, 2012) ("Mid Continent SV Submission") (providing the Report); Itochu First SV Submission at Ex. 7 (providing the Dneprometiz financial statement). The court finds no need to discuss whether the internet link to the Report was always functional or not.

statement itself or the record as a whole compel us to overlook public availability as an important criterion." Id. Accordingly, Commerce selected the Thai financial statements over Dneprometiz's statement. Id.

Itochu argues that substantial evidence does not support Commerce's conclusion that the Dneprometiz financial statement is not publicly available. Itochu Br. at 12–24. First, Itochu argues that Dneprometiz's financial statement is available to more than just shareholders, and thus, is publicly available. Id. at 18–21. Itochu claims that substantial similarities between the Report and the Dneprometiz financial statement is evidence of this. Id. at 13, 18–19. In addition, Itochu argues that Dneprometiz's response to Mid Continent's e-mail is ambiguous, and to the extent it cuts against public availability, it should not be credited given that the question came from an unknown, foreign law firm. Id. at 19–20; Itochu's Reply to the United States' and Mid Continent Nail Corp.'s Resps. to Itochu's Rule 56.2 Mot. for J. upon the Agency R. at 4, ECF No. 48 ("Itochu Reply Br."). Separately, Itochu argues that Dneprometiz is "mandated to disclose [its] financial and operational activities" because it is a "public company registered on the Ukrainian Stock Exchange." Itochu Br. at 18.[11] Second, Itochu contends that, even if Dneprometiz's website is correct that the financial statements are available only to shareholders, the statements are publicly available because information need not be "published" to be publicly available. Id. at 14–18.

---

[11] In its supplemental briefing, Itochu argues that the Dneprometiz financial statement is publicly available because of record evidence from a separate, subsequent administrative review showing that the financial statement is accessible from the Ukrainian stock exchange regulator's website. Itochu's Suppl. Br. in Resp. to the Ct.'s Order of Mar. 23, 2015 5–6, ECF No. 73. But, this evidence was not submitted in the instant review, and "each administrative review is a separate segment of proceedings with its own unique facts." Peer Bearing Co.–Changshan v. United States, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008) (quoting Shandong Huarong Mach. Co. v. United States, 29 CIT 484, 491 (2005)). Accordingly, the court will not consider it.

Mid Continent responds that the Report does not provide evidence for Itochu's conclusion that Dneprometiz's financial statement is publicly available. Mid Continent Br. at 20–25. Mid Continent highlights "numerous, significant discrepancies" between the financial statement and the Report—that the Report has no auditors' notes, no fixed asset schedule or depreciation schedules, no listing of "beginning-and end-of-period inventory valuations," no specific income and expense items, and no statement of cash flows. Id. at 21–22, 26. Furthermore, Mid Continent faults Itochu for failing to establish the provenance of the financial statement it placed on the record. Id. at 22–23. Lastly, Mid Continent states that "Commerce practice requires that it and other interested parties be able to obtain financial statements before they will be considered publicly available," and that this requirement was not satisfied here. Id. at 24 n.3. The government responds largely by repeating Commerce's statements found in the I&D Memo. Gov't Br. at 13–16.

B. Discussion

Commerce must use the "best available information" when selecting financial statements to be used in calculating the surrogate financial ratios. See 19 U.S.C. § 1677b(c)(1)(B); Goldlink Indus. Co. v. United States, 30 CIT 616, 618, 431 F. Supp. 2d 1323, 1326 (2006). The "best available information" is generally "publicly available information," see 19 C.F.R. § 351.408(c)(1), because "publicly available information addresses the concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability." Since Hardware (Guangzhou) Co. v. United States, 911 F. Supp. 2d 1362, 1367 (CIT 2013) (internal quotation marks omitted). Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 26 CIT 434, 438, 201 F. Supp. 2d 1316, 1321 (2002).

Substantial evidence supports Commerce's conclusions that the Dneprometiz financial statement is not publicly available. Even assuming all Itochu's arguments, the Dneprometiz financial statement is not fully publicly available because the Report is missing several of the statement's sections. Notably, although the Dneprometiz financial statement itself includes information used in the surrogate financial ratio calculation process, such as "raw material cost," "labor costs," "social overhead costs," and "other operating costs," the Report lacks any of this information. See Mid Continent Surrogate Value Submission at Ex. 2, PD 316–18 (Oct. 1, 2012) ("Mid Continent SV Submission"); Itochu First SV Submission at Ex. 7 at 21; Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7 (explaining surrogate financial ratios calculation factors); I&D Memo at 14 (stating that the Report contains only "summary information" and has "discrepancies" with the Dneprometiz financial statement); see also Mid Continent Br. at 26 (listing other items lacking in the Report).[12]

---

[12] The court is not convinced by Itochu's other explanations as to why the Dneprometiz financial statement is publicly available. Itochu's contention that Dneprometiz is "mandated to disclose [its] financial and operational activities" because it is a "public company registered on the Ukrainian Stock Exchange" was simply pulled by Itochu from the Report. See Itochu Br. at 18; Mid Continent SV Submission at Ex. 2 at 21. Neither the Report nor Itochu indicate whether Dneprometiz is required to actually disclose the financial statement in question, whether the disclosure is simply to a single government office or to the public in general, whether members of the public can obtain the financial statement if the disclosure is only to a government office, or even the legal basis for this requirement. Accordingly, Commerce reasonably did not accept this argument.

In addition, Itochu's contention that the Dneprometiz financial statement is publicly available because it is disclosed to shareholders is baseless. Commerce's implicit finding that shareholders are not the "public" is a reasonable interpretation of its regulations. See Reizenstein v. Shinseki, 583 F.3d 1331, 1335 (Fed. Cir. 2009) ("[T]he agency's construction of its own regulations is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" (quoting Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1364 (Fed. Cir. 2005))); Public, MERRIAM-WEBSTER DICTIONARY (last visited May 31, 2017), available at http://www.merriam-webster.com/dictionary/public (defining "public" as "exposed to general view," or "of, relating to, or affecting all the people or the whole area of a nation or

(continued . . .)

But, Itochu aptly notes that the Report clearly drew from the financial statement. For example, the following line items represent some of the similarities between the two documents, with the Dneprometiz financial statement's numbers listed first followed by the Report's numbers, reported in thousand Ukrainian Hryvnia ("UAH") — Income/Revenue (804,428/804,219); Value added tax (75,133/75,036); Administrative expenses (24,696/26,835); Financial expenses (7,850/7,850); Other expenses (2,323/2,400). See Mid Continent SV Submission at Ex. 2; Itochu First SV Submission at Ex. 7 at 20. Furthermore, Itochu's contention finds support in the fact that several line items in Dneprometiz's "[f]or the previous period" column closely match numbers given in the Report in a column from the previous year, that is, the same year as the financial statement's "previous period." Mid Continent SV Submission at Ex. 2; Itochu First SV Submission at Ex. 7 at 20–21.[13] Nonetheless, as discussed above, Commerce is correct that the Dneprometiz financial statement is not as fully publicly available as the Thai financial statements.

This, however, may not be the end of the inquiry in this case. As Commerce acknowledges, public availability is an important criterion; it is not, however, an absolute requirement. Commerce may yet have to address whether it has sufficient reliable financial data

---

state"). Itochu also relies on Shantou Red Garden Foodstuff Co. v. United States, 815 F. Supp. 2d 1311 (CIT 2012) for its argument, but that case does not support Itochu's contention. In Shantou Red, the court found Commerce's determination that export price data from the Ecuadorean Central Bank was not publicly available to be unsupported by substantial evidence. Id. at 1327, 1330. But, in Shantou Red, unlike here, any person, not just shareholders, could potentially obtain a copy of the data by asking the Ecuadorean Central Bank for a copy. Id. at 1327.

[13] Commerce's concerns about Dneprometiz's website's statement that the financial statements are only available to shareholders, and Dneprometiz's e-mail response to Mid Continent, do not belie the fact that clearly at least some of the Dneprometiz financial statement's data appears in the Report, even if the numbers are slightly different.

from the Ukraine to calculate the surrogate financial ratios it needs for general expenses and profit as part of normal value. First, it must decide if the key wire rod value data from the Ukraine is superior to that of Thailand or not.

## CONCLUSION

It goes without saying that Commerce must put aside any consideration of who wins and who loses, i.e., whether the margin is driven higher or lower. Once a decision is made as to which data set for steel wire rod is superior, Commerce should proceed to weigh its preferences for a single surrogate country and publicly available financial data. If Ukraine has the superior wire rod data, Commerce shall consider whether the financial data from Ukraine is sufficiently reliable to use despite its technical lack of public availability. Commerce also has the choice to mix data sets from different countries if the Ukraine steel wire data is clearly superior. If the Thailand steel wire data is equal or superior, the suitability of the financial data from Thailand does not appear to present a serious issue.[14] In sum, there are a number of factors and

---

[14] The Thai financial statements' lack of a cash flow statement does not detract from Commerce's use of the Thai financial statements. See I&D Memo at 15 ("[T]he lack of [cash flow] statements does not render [the Thai] financial statements any less useful."). Itochu itself notes that Commerce "does not consider Cash Flow statements when computing financial ratios. . . ." Itochu Rebuttal Case Brief at 16, PD 341 (Oct. 26, 2012) ("Itochu Rebuttal Agency Br.").

Itochu hints at another defect with the Thai statements in stating that the Dneprometiz statement "is completely disaggregated, separately providing discrete individual expense and income line items, thereby enabling [Commerce] to compute financial ratios with the highest degree of accuracy." Itochu Br. at 23; Itochu Rebuttal Agency Br. at 16. Commerce did not address this concern in its I&D Memo. To the extent Itochu argues the Thai financial statements lack discrete individual expense and income line items, Itochu failed to present this argument to Commerce. Thus, Commerce cannot be faulted for failing to address it. On remand, Commerce may address it if relevant. In its rebuttal case brief before Commerce, Itochu highlights that Dneprometiz's financial statement "is sufficiently well disaggregated," and makes a general statement that "Dneprometiz's financial statement is distinctly superior to the two Thai financial statements available on the record." Itochu Rebuttal Agency Br. at 16. But, Itochu does not

(continued . . .)

preferences for Commerce to consider and weigh.  Commerce has discretion to put aside some normal preferences if a more accurate result will be achieved.  For the foregoing reasons, Itochu's motion for judgment upon the agency record is granted in part, and denied in part.

Commerce shall file its remand determination with the court before or on August 4, 2017.  The parties shall have until September 5, 2017, to file objections, and the government will have until September 19, 2017, to file its response.

                                                                                  /s/ Jane A. Restani
                                                                                    Jane A. Restani
                                                                                        Judge

Dated: June 5, 2017
       New York, New York

---

specifically claim or identify a problem with the Thai financial statements' expense or income line items.  See id.