Slip Op. 18-3

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ITOCHU BUILDING PRODUCTS CO., INC., TIANJIN JINGHAI COUNTY HONGLI INDUSTRY & BUSINESS CO., LTD., HUANGHUA JINHAI HARDWARE PRODUCTS CO., LTD., TIANJIN JINCHI METAL PRODUCTS CO., LTD., SHANDONG DINGLONG IMPORT & EXPORT CO., LTD., TIANJIN ZHONGLIAN METALS WARE CO., LTD., HUANGHUA XIONGHUA HARDWARE PRODUCTS CO., LTD., SHANGHAI JADE SHUTTLE HARDWARE TOOLS CO., LTD., SHANGHAI YUEDA NAILS INDUSTRY CO., LTD., SHANXI TIANLI INDUSTRIES CO., LTD., MINGGUANG ABUNDANT HARDWARE PRODUCTS CO., LTD., CHINA STAPLE ENTERPRISE (TIANJIN) CO., LTD., and CERTIFIED PRODUCTS INTERNATIONAL INC., <br><br> Plaintiffs, <br><br> .v. <br><br> **UNITED STATES,** <br><br> Defendant, <br><br> **MID CONTINENT NAIL CORPORATION,** <br><br> Defendant-Intervenor. | **Before: Jane A. Restani, Judge** <br><br> **Court No. 13-00132** <br><br> **PUBLIC VERSION** |

## **OPINION**

[Commerce's final remand redetermination results in antidumping duty administrative review sustained.]

Dated:  January 18, 2018

Bruce M. Mitchell, Andrew Thomas Schutz, Dharmendra Narain Choudhary and Ned Herman Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, and Washington, D.C., for plaintiffs Itochu Building Products Co., Inc., Tianjin Jinghai County Hongli Industry & Business Co., Ltd., Huanghua Jinhai Hardware Products Co., Ltd., Tianjin Jinchi Metal Products Co., Ltd., Shandong Dinglong Import & Export Co., Ltd., Tianjin Zhonglian Metals Ware Co., Ltd., Huanghua Xionghua Hardware Products Co., Ltd., Shanghai Jade Shuttle Hardware Tools Co., Ltd, Shanghai Yueda Nails Industry Co., Ltd., Shanxi Tianli Industries Co., Ltd., Mingguang Abundant Hardware Products Co., Ltd., China Staple Enterprise (Tianjin) Co., Ltd., and Certified Products International Inc.

Sosun Bae, Lead Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. Also on the brief was Tara Kathleen Hogan, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice. Of counsel on the brief was Jessica Rose DiPietro, Attorney, International Trade Administration, U.S. Department of Commerce.

Adam Henry Gordon, and Ping Gong, The Bristol Group PLLC, of Washington, DC, for defendant-intervenor Mid Continent Nail Corporation.

**Restani, Judge**: In this action, Plaintiffs Itochu Building Products Co., Inc., Tianjin Jinghai County Hongli Industry & Business Co., Ltd., Huanghua Jinhai Hardware Products Co., Ltd., Tianjin Jinchi Metal Products Co., Ltd., Shandong Dinglong Import & Export Co., Ltd., Tianjin Zhonglian Metals Ware Co., Ltd., Huanghua Xionghua Hardware Products Co., Ltd., Shanghai Jade Shuttle Hardware Tools Co., Ltd., Shanghai Yueda Nails Industry Co., Ltd., Shanxi Tianli Industries Co., Ltd., Mingguang Abundant Hardware Products Co., Ltd., China Staple Enterprise (Tianjin) Co., Ltd., and Certified Products International Inc. (collectively "Itochu"), challenge the U.S. Department of Commerce ("Commerce")'s final redetermination results pursuant to Itochu Building Products Co., Inc. v. United States, Slip Op. 17–66, 2017 WL 2438835 (CIT June 5, 2017) ("Itochu I"). Final Results of Redetermination Pursuant to Itochu Building Products Co., Inc. v. United States Court No. 13-132, Slip Op. 17-66 (Ct. Int'l Trade June 5, 2017), A-570-909, Remand (Dep't Commerce August 21, 2017) ("Remand Results"). Itochu requests that the court hold Commerce's redetermination decision, to value wire rod based on Global Trade

Atlas ("GTA") import data from Thailand rather than Metal Expert data from Ukraine, is not supported by substantial evidence. Accordingly, Itochu requests that Commerce select Metal Expert data, instead of Thai GTA import data, to value the principal input in subject nails – steel wire rods – whether or not Ukraine is ultimately selected as the primary surrogate country. The court suggested that this might be the appropriate result if the primary input value was from the Ukraine. Itochu I at *7. Conversely, Defendant, the United States, requests the court sustain Commerce's Remand Results.

## BACKGROUND

On October 3, 2011, Commerce initiated a third administrative review of the antidumping duty order on certain steel nails from the People's Republic of China ("China"), covering the period of review ("POR") from August 1, 2010 through July 31, 2011. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 76 Fed. Reg. 61,076, 61,076–84 (Dep't Commerce October 3, 2011). On March 18, 2013, Commerce published the final results from that review. See Certain Steel Nails From the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2010-2011, 78 Fed. Reg. 16,651, 16,651–54 (Dep't Commerce March 18, 2013) ("Final Results"); see also Certain Steel Nails From the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review A-570-909, POR 08/01/2010–07/31/2011 (Dep't Commerce March 5, 2013) ("I&D Memo").[1] Specifically, Itochu

---

[1] Because Commerce considers China a non-market economy ("NME"), Commerce creates a hypothetical market value for steel nails in conducting its review. See Downhole Pipe & Equip. LP v. United States, 887 F. Supp. 2d 1311, 1320 (CIT 2012) (citing Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999)). To construct such a value, Commerce relies on data from a market economy or economies to provide surrogate values for the various factors of production used to manufacture the subject merchandise. See 19 U.S.C. § 1677b(c)(1)(B). In addition, Commerce uses financial statements from producers of identical or comparable

challenged Commerce's selection of surrogate financial statements and surrogate valuation for steel wire rod, the main input in steel nails, arguing that: (1) GTA steel wire rod import data from Thailand were not the best available; and (2) financial statement data from Thai companies were not the best available.[2] See Itochu I at *2–*7.

On June 5, 2017, the court remanded the Final Results for Commerce to reconsider its selection of Thai import data as a surrogate value for steel wire rod, specifically directing Commerce to make two determinations: (1) whether Thai GTA import data, Ukrainian GTA import data, and Ukrainian Metal Expert data are "comparably specific"; and (2) whether diameter or carbon content is a more important factor in determining whether a surrogate source provides prices specific to the steel wire rod used by respondents. Itochu I at *7–*8. In the Remand Results, Commerce found that Thai import data were still the best available, and provided revised rationale for this conclusion. Remand Results at 1.

On remand, Commerce reconsidered its evaluation of the surrogate valuation of the main input, steel wire rod. Id. Specifically, Commerce reconsidered two factors in determining the relative specificity of Ukrainian Metal Expert, Ukrainian GTA, and Thai GTA data sets: wire rod

---

merchandise to yield surrogate financial ratios to calculate "general expenses and profit" for inclusion in normal value. See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 366 F. Supp. 2d 1264, 1277 n.7, 29 CIT 288, 303 n.7 (2005).

[2] Commerce identified six potential surrogate countries on the record that were at a level of economic development comparable to China and were significant producers of comparable merchandise, but only two countries, Thailand and Ukraine, had record data for sourcing surrogate values. Certain Steel Nails From the People's Republic of China: Preliminary Results and Partial Rescission of the Third Antidumping Administrative Review, 77 Fed. Reg. 53,845, 53,848 (Dep't Commerce September 4, 2012). Of these, Commerce determined that Thailand provided the best opportunity to use quality, publicly available data, and that Thai financial statements were usable, unlike Ukrainian financial statements. Thus, Commerce selected Thailand as the primary surrogate country and used the audited, publicly available Thai data to value respondents' inputs. I&D Memo at 12–13.

diameter and carbon content of the steel. Id. at 4. Commerce determined, contrary to its previous conclusion, that the three data sources for valuing steel wire rod are not comparably specific to the wire rod input. Id. at 3. Commerce first considered whether the data were: (1) publically available; (2) contemporaneous with the period of review; (3) representative of a broad-market average; (4) from an approved surrogate country; and (5) tax- and duty-exclusive. Id. at 4–5. Commerce determined that Thai and Ukrainian GTA import data met each of these criteria, but on reexamination found that Ukrainian Metal Expert data were not exclusive of taxes. Id. at 5–6. Commerce then reviewed Thai and Ukrainian GTA data sets to determine which was more specific to respondents'[3] steel wire rod input, finding the Thai data set superior. Id. at 15–16.

Commerce also addressed the court's concerns with respect to the importance of carbon content in determining whether certain data are specific to the inputs utilized. Id. at 8–10. As an initial matter, Commerce explained that rod diameter and carbon content are two physical characteristics of steel wire rod, the main input used by respondents. Id. at 8. Accordingly, Commerce stated that a data source more specific to both of these physical characteristics is generally more specific to the input. Id. at 9. Additionally, Commerce stated that carbon content is more important than diameter because "carbon content is the only characteristic to remain intact/unchanged during the production process from the steel wire rod input to the steel nail output." Id.

---

[3] The examined mandatory respondents were Tianjin Jinghai County Hongli Industry & Business Co., Ltd. ("Hongli"), and Stanley Black & Decker, Inc., The Stanley Works (Langfang) Fastening Systems Co., Ltd., and Stanley Fastening Systems LP ("Stanley"). I&D Memo at 1. Only Hongli received a positive rate. Final Results, 78 Fed. Reg. at 16,653. Thus, its rate became the rate for all respondents who established that they were separate from the China-wide entity, such as Itochu. See id.

Commerce determined that Ukrainian GTA data and Thai data are preferable to Ukrainian Metal Expert data because Ukrainian Metal Expert data were not tax exclusive and do not include diameter-specific data corresponding to the input of one of the respondents. Id. at 6–7. Because record evidence demonstrates that Thai GTA data are more specific to the carbon content of wire rod consumed by respondents than Ukrainian GTA data, Commerce determined that Thai GTA data was more specific on both physical characteristics. Id. at 10–11. Commerce thus determined that Thai GTA data constitutes the best available evidence to value Itochu's wire rod input and the principal surrogate country would remain Thailand. Id. at 11.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court upholds Commerce's final results in an antidumping duty review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Itochu alleges Commerce's Remand Results are deficient in four respects. First, Thai GTA import data (which combines steel rods and steel bars) is not product-specific, unlike Ukrainian Metal Expert data (which is limited to steel wire rod). Pl. Comments at 4–11. Second, Metal Expert data is significantly less distorted and more specific than Thai GTA data in terms of the diameter of steel wire rod consumed by the respondents. Id. at 11–17. Third, carbon content is not only a less important physical attribute as compared to the diameter of steel wire rod, but it has no discernible influence on the price of steel wire rod, which is priced and commercially traded based on its diameter. Id. at 17–23. And finally, the record provides all information necessary to compute a tax exclusive value for steel wire rod from Metal Expert data. Id. at 23–24.

The court begins by observing the general principle that Commerce is granted "considerable discretion in choosing the 'best available information' on the record." Changshan Peer Bearing Co., Ltd. v. United States, 44 F. Supp. 3d 1399, 1407 (CIT 2015) (citing Nation Ford, 166 F.3d at 1377–78; QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

I.      **Thai GTA Data Is Not Rendered Unusable By The Potential Inclusion of Steel Bars**

In its opinion ordering remand, the court noted a seemingly important difference between Thai GTA data and Metal Expert data, that: "Metal Expert data reports prices for wire rods with a diameter of 6.5 mm to 8 mm, whereas GTA import data reports prices for wire rods and bars with a diameter of 14 mm and under." Itochu I at *4 (emphasis added). The court questioned whether "a category which also covers bars is even probative." Id.

In its redetermination, Commerce reviewed whether the Thai HTS category used was distortive. Itochu argued that the six-digit HTS for Ukraine includes bar, and thus bar must be included in the eleven-digit Thai tariff code. Remand Results at 15; First Surrogate Value Submission: Third Antidumping Duty Administrative Review of Certain Steel Nails From the People's Republic of China, A-570-909, POR 08/01/10-07/31/11, at Ex.4, p.104 (April 30, 2012) ("Itochu Surrogate Value Submission") (English-language description for Ukrainian HTS categories reading: "bars and rods, in irregularly wound coils, of iron or non-alloy steel: Of circular cross-section measuring less than 14 mm in diameter: Other"). Commerce determined that the record does not definitively demonstrate that the more specific HTS categories it used contain steel bar.[4] Remand Results at 15. Commerce explained that "[t]he record does not contain

---

[4] The four Thai HTS categories, which Commerce averaged, include: "(1) HTS 7213.91.0010 "Wire Rod Less Than 14 mm in Diameter, Containing By Weight Not More Than 0.08% of Carbon"; (2) HTS 7213.91.00.20 "Wire Rod Less Than 14 mm in Diameter, Containing By Weight More Than 0.08% But Not More Than 0.10% Of Carbon"; (3) HTS 7213.91.00.30 "Wire Rod

Case 1:13-cv-00132-JAR   Document 120   Filed 01/18/18   Page 8 of 14

PUBLIC VERSION
Consol. Court No. 13-00132                                                                                              Page 8

the full description of the Thai HTS classifications," but contains only references to carbon content. Remand Results at 15. See Certain Steel Nails From the People's Republic of China: Submissions of Surrogate Values, A-570-909, POR 08/01/2010-07/31/2011 at Ex.1, p.3 (April 30, 2012) (Thai GTA data from Mid-Continent Nail Corporation). Moreover, it appears to the court that the carbon specific categories of small round stock Commerce now states it used are unlikely to contain unrelated product.

Itochu asserts that Commerce failed to share its alleged analysis of product descriptions under specific Thai HTS subheadings – six digits and beyond – with the parties to the original Final Results, and insists it is unclear why Commerce concluded that all Thai HTS subheadings used in the Final Results did not include both bars and rods. Pl. Comments at 10. According to Itochu, at a minimum, Commerce should have specified at least one Thai HTS subheadings used in the Final Results that was specific and exclusive to rod, and not bar. Id. Rather than performing a comprehensive analysis, considering all record evidence including that which detracted from its findings, Itochu claims Commerce instead chose to offer an unsupported conclusion that is contrary to substantial record evidence. Id.

First, the notice issue with regard to exactly which HTS categories were used was rectified during the remand proceedings. I&D Memo at 17. Second, there is no actual evidence that the HTS categories used contained bar. See id; Surrogate Value Memo at Attach. 2. Finally, the potential inclusion of bar is not necessarily determinative as to whether the categories are

---

Less Than 14 mm in Diameter, Containing By Weight More Than 0.10% But Not More Than 0.18% Of Carbon"; and (4) HTS 7213.91.00.40 "Wire Rod Less Than 14 mm in Diameter, Containing By Weight More Than 0.18% But Less Than 0.25% Of Carbon." I&D Memo at 17. See also Antidumping Administrative [sic] at Certain Steel Nails From the People's Republic of China: Surrogate Values for the Final Results, A-570-909, POR 08/01/2010–07/31/2011, at Attach.2 (Dep't Commerce March 5, 2013) ("Surrogate Value Memo").

Case 1:13-cv-00132-JAR   Document 120   Filed 01/18/18   Page 9 of 14

**PUBLIC VERSION**
Consol. Court No. 13-00132                                                                                           Page 9

sufficiently probative as to input value. Ultimately, Commerce found the diameter and carbon content specifications of the Thai GTA data sufficient. Remand Results at 15–17. The record data does not require a different result, as will be discussed further infra.

**II.  Substantial Evidence Supports Commerce's Finding That Ukrainian GTA Data And Thai GTA Data Are More Probative Than Metal Expert Data, Even As To Diameter**

Commerce's determination on remand that GTA data are more specific than Ukrainian Metal Expert data is supported by substantial evidence. Commerce found that Ukrainian Metal Expert data is only partially specific to the steel wire rod inputs used by respondents, while both Ukrainian and Thai GTA import data sets are specific in the sense that all wire rod diameters used by respondents fall within Ukrainian and Thai GTA import data. Remand Results at 3. In support of its findings, Commerce noted that because "one of the respondents [[(       )]][5] reported consumption of steel wire rod with diameters outside of this range [[            ]] . . . we find that the Ukrainian Metal Expert data are only partially specific as the data are not diameter-specific with regard to certain of the wire rod input consumed by [[      ]] respondents." Id. at 7.[6]

Itochu argues that Ukrainian Metal Expert data are "less imperfect and more probative of the input utilized by the respondents." Pl. Comments at 16. Itochu makes three arguments: (1) the "Metal Expert data covers exclusively steel wire rods;" (2) "Metal Expert also provides an additional level of specificity, i.e., it provides prices of the specific grade of steel rod"; and (3)

---

[5] Confidential information is indicated by double brackets.

[6] [[

   ]]

"<u>missing</u> price data of [certain] wire rods" is better than a "diameter range . . . too wide" because "it is reasonable to infer that [Metal Expert] prices would be in close proximity of the steel wire rod prices reported." <u>Itochu's Comments pursuant to Draft Remand Determination in the Third Administrative Review of Certain Steel Nails From the People's Republic of China</u>, A-570-909, Remand at 8-9 (August 16, 2017).

Itochu maintains that Commerce's findings are unpersuasive because [[     ]] of steel nails produced from wire rod and sold by the mandatory respondents, Hongli and Stanley, during the POR were produced from rod of [[     ]] diameter. Pl. Comments at 12. Accordingly, Itochu argues Metal Expert data for steel wire rod of 6.5 to 8 mm diameter range is specific by diameter for [[     ]] of steel wire rod consumed by Hongli and Stanley during the POR. <u>Id.</u> Furthermore, Itochu insists that the mere fact that [[     ]] steel wire rods outside of the diameter range of 6.5 to 8 mm were used by respondents, by itself, fails to support Commerce's conclusion that Thai and Ukrainian GTA import data are more diameter-specific than Ukrainian Metal Expert data. <u>Id.</u>

Commerce addressed the relative specificity of Ukrainian Metal Expert data and GTA data in its remand redetermination with respect to each respondent, rather than aggregating the experiences of both respondents, as does Itochu. <u>See</u> <u>Remand Results</u> at 7, 15–16; <u>see also</u> Pl. Comments at 14–15 ("The above chart shows that in the aggregate . . ."). Thus, Itochu's percentage figure is not as probative as Itochu suggests.

Although GTA data cover a wider range of diameters, i.e., less than 14 mm, the inputs of both mandatory respondents are covered. The record supports Commerce's finding that Ukrainian Metal Expert data only report aggregated spot prices with a diameter range of 6.5 to 8 mm,

excluding diameters of wire rod input [[                                                    ]].[7] Remand Results at 7; Itochu Surrogate Value Submission at Ex.5, p.3, 19–21; [[

]]. Thus, Ukrainian Metal Expert data are only specific to one of the respondents, whereas GTA data covered the diameters consumed by both respondents. Despite not insignificant arguments against Commerce's choice, the choice of GTA data is supported by substantial evidence.

III.   **Substantial Evidence Supports Commerce's Determination That The Carbon Content of Wire Rod – The Primary Input in Steel Nails – Should Be Afforded More Emphasis Than Diameter in its Surrogate Value Choice**

In its opinion ordering remand in the context of Commerce's previous determination of equal specificity, the court directed Commerce to determine whether carbon content is more important than wire rod diameter in selecting a surrogate value. See Itochu I at *4. Itochu argues Commerce "misconstrued the question [of] whether the carbon content has a greater impact on the price of steel wire rod than does the rod's diameter" and that Commerce's assertion that carbon content is more important is not based on substantial evidence. Pl. Comments at 20–21.

Itochu argues there is no record evidence that the carbon content of the steel wire rod input plays a role in determining the price of the input. Id. Itochu asserts that "[t]he fact that carbon content is not mentioned on the [Ukrainian Metal Expert or Indian JPC steel wire rod] price lists indicates that as compared to the diameter, carbon content has a minimal influence (if at all) on the market price of steel wire rod." Id.

Despite Itochu's argument, Commerce was not required to find diameter determinative as to specificity. The record evidence actually demonstrates carbon content is at least as important

---

[7] [[

]]

as wire rod diameter in evaluating the specificity of HTS categories. Specifically, purchase invoices and mill certificates from the purchaser and producer of steel nails identify both the carbon content and diameter. Response Pertaining to Stanley's Second Supplemental Section C and D Questionnaire, A-570–909, POR 08/01/2010–07/31/2011, at Ex.SSCD-7 (July 25, 2012); Response Pertaining to Hongli's Supplemental Section C Questionnaire, A-570-909, POR 08/01/2010–07/31/2011, at Ex.SC5-8 (June 8, 2012)). Additionally, while not of enormous weight, carbon content is identified as part of the steel grade or type, which from the outset has been one of the physical characteristics aligned with Commerce's product matching control number. Remand Results at 9. Further, the court cannot say that the HTS division, first by diameter and then by carbon content, must drive Commerce's decision. In making a surrogate value determination, Commerce does not have the exact same concerns as do Customs' classifiers. See Jiasheng Photovoltaic Technology Co., Ltd. v. U.S., 28 F. Supp. 3d 1317, 1334 (CIT 2014).

Commerce also explained that the record evidence demonstrates "carbon content weighs more heavily than diameter" because the producer requires a "carbon-specific input to produce a particular carbon-specific output." Remand Results at 9. Further, Commerce noted that although the diameter of the wire rod may change throughout the production process, rendering the initial diameter less important, carbon content is the only characteristic to remain unchanged during the production process. Id. Record evidence demonstrates that respondents produced several different diameter outputs from the same diameter input. Id. at 10 (citing Hongli's Section C&D Response at Ex.D–2A, p.1 ("As the rod is drawn through different size dies that reduce the wire rod to the desired diameter . . .")).

Commerce's determination that the mutability of the wire rod input and substitutability of stock of different diameters lessens the importance of diameter, is adequately supported.

Ultimately, the choice of greater reliance on carbon content than diameter specificity is within the range of choices permitted by the discretion afforded to Commerce. See, e.g., Jacobi Carbons AB v. United States, 992 F. Supp. 2d 1360, 1370–71 (CIT 2014) ("[T]he court finds that plaintiffs are correct, that the factors of production <u>actually used</u> by a respondent are important, if not controlling, when determining normal value.") (emphasis added). Thus, the choice to use Thai GTA data, which covered respondents' actual experience is reasonable.

## CONCLUSION

Commerce's determination that Thai GTA data are the best available information to value steel wire rod is supported by substantial evidence. On remand, Commerce reasonably determined: (1) Ukrainian Metal Expert data is not tax- and duty- exclusive[8] and is not superior as to physical specificity to GTA data; and (2) Thai and Ukrainian GTA data provide information for both diameter and carbon content, but Thai GTA data are more specific to respondents' actual production processes, Hongli's Section C&D Response at 3–4 and Stanley's Section C Response at 11–12, Exhibit C-5 (Jan. 19, 2012) (showing use of medium and low carbon content inputs), while Ukrainian GTA do not specifically refer to medium-content carbon, see Itochu Surrogate Value Submission at Ex.4, p.104. Finally, because Ukraine did not provide better data for the main input, wire rod, and Commerce did not reconsider its selection of the primary surrogate country, issues as to financial ratios derived from Ukraine data did not affect the remand determination.

---

[8] Because Commerce did not have VAT data for the POR, the "simple" adjustments suggested by Itochu actually present a more substantial challenge than Itochu acknowledges. But had the Ukrainian Metal Expert data been clearly more specific, Commerce might have been required to take the additional steps. It was not.

Accordingly, Commerce's Remand Results are based on substantial evidence and are in accordance with the law. For the foregoing reasons, the court sustains Commerce's Remand Results and enters final judgment in favor of the United States.

                                                                    /S/   Jane A. Restani
                                                                        Jane A. Restani
                                                                              Judge

Dated: January 18, 2018
       New York, New York